UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
ANGEL CLASS,

                              Petitioner,                   **MEMORANDUM AND ORDER**
                                                              13-CV-4340 (RRM)
             -against-

WILLIAM LEE,

                              Respondent.
-------------------------------------------------------x
ROSLYNN R. MAUSKOPF, United States District Judge.

Angel Class, proceeding *pro se*, petitions this Court for a writ of habeas corpus pursuant

to 28 U.S.C. § 2254, asserting that his June 11, 2009, conviction for manslaughter in the first

degree, assault in the second degree, and criminal possession of a weapon in the fourth degree

was unconstitutional.  For the reasons set forth below, Class's petition for a writ of habeas corpus

is denied and this action is dismissed.

## BACKGROUND

Around 5:00 a.m. on July 9, 2005, Michael Geroulakis and Dimitri Zisimopoulos were

stabbed after their car was surrounded by a group of men.  Several months after the incident and

after Zisimopoulos had died from his wounds – Geroulakis and another eyewitness, Michael

Luna, viewed lineups and identified Class as the man who stabbed Geroulakis and Jonathan

Andujar as the man who stabbed Zisimopoulos.  At a subsequent lineup, Luna identified Juan

Gonzalez as one of the men who surrounded the car.  On the same day he was identified,

Gonzalez made written statements and oral statements to the police.

Following these identifications, Class, Andujar, and Gonzalez were jointly indicted, upon

an acting-in-concert theory, of murder in the second degree, (N.Y. Penal Law § 125.25(2));

manslaughter in the first degree, (*id.*, § 125.20(1)); assault in the second degree, (*id.*, §

120.05(2)); and two counts of criminal possession of a weapon in the fourth degree, (*id.*, §

1

265.01(2)).  Prior to trial, the parties discussed how to redact one of Gonzalez's oral statements in which he stated that, following the incident, he, "Angel," and others talked "about Angel stabbing the kid."  (T. 4–5.)[1]  Although all parties agreed to redacting the reference to Angel, Assistant District Attorney Peter Lomp proposed "that the redaction or edit … be that … we talked about the kids that got stabbed without saying how Angel stabbed him."  (T. 6.)  After the trial judge, Justice Michael Aloise, stated that he would not reword the statement but reserved decision on the redaction, Class's attorney, Russell Rothberg, requested that Class "get a separate jury" which would not hear Gonzalez's statement that someone was stabbed.  (T. 7.)  The judge did not rule on this severance application.

During voir dire, Justice Aloise ruled that the reference to "Angel stabbing the kid" would be redacted.  (T. 24.)  Mr. Rothberg did not renew his request for a severance or remind Justice Aloise that this request was still outstanding.  Accordingly, Class was tried before the same jury as his co-defendants, Andujar and Gonzalez.

**A.  The People's Case**

Although 13 witnesses testified for prosecution at trial, only two of them – Geroulakis and Luna – were eyewitnesses to the stabbing itself.  They and four others – Class's aunt, Marlene Class; her friend, Rosie Maldonado; Maldonado's fiancé, Sandy Rodriquez; and New York Police Sergeant James Heffernan – testified to events that occurred at 32nd Street and Broadway in Astoria (the "Intersection") shortly before the stabbing.

Maldonado, who was subpoenaed to testify by the People, testified that during the early morning hours of July 9, 2005, she was at a club, "Click," located near the Intersection, to celebrate the birthday of her friend and Marlene's sister, Emily Class.  (T. 1045.)  She and Rodriguez had picked up Marlene and Emily earlier that evening in Rodriguez's Chevy Blazer at

---

[1] Numbers in parentheses preceded by "T" denote pages in the trial transcript (Doc. No. 10).

the sisters' home on Division Avenue in Williamsburg.  (T. 1046–47, 1119.)  Although Maldonado could not recall if the Blazer was gold or grey, Rodriguez – who testified at trial voluntarily – clarified that it was grey.  (T. 1046, 1117–18.)

They stayed at the club for at least three hours, during which time they were joined by about eight other people.  (T. 1047–48, 1120.)  While Maldonado could not recall all of their names, she distinctly recalled that one of the people was Emily's nephew, Angel, whom she identified in court as Class.  (T. 1056.)  Maldonado had known Class "since he was a little kid," saw him every eight months or so, and knew that he moved back and forth between Florida and the Clemente Houses in Williamsburg, where the Class sisters lived.  (T. 1056, 1078.)

Marlene Class also recalled that her nephew, Angel, was at Emily's birthday party at Click.  (T. 1177–79.)  However, unlike Maldonado, she knew the names of at least two of the men who were with him:  Jonathan and Cito.  (T. 1179.)  In court, she identified Class as Angel, Andujar as Jonathan, and Gonzalez as Cito.  (T. 1179–80.)  She testified that all three men lived in the Clemente Houses and that she was "sure" Andujar was Class's friend.  (T. 1180.)

Maldonado left the club with Rodriguez at around 4:00 a.m. to find "[p]eople on the corners everywhere."  (T. 1048–49.)  Maldonado was talking to Rodriguez and Emily when there was a "commotion," during which Emily was struck by an unknown Hispanic man.  (T. 1049–50.)  Rodriguez and others chased the man down, then held him until police arrived.  (T. 1123, 1160–61, 1169.)  When he saw the police approaching, Rodriguez went to retrieve his car while Emily, who wanted to press charges, spoke to the police.  (T. 1050, 1122–23.)

Geroulakis, Zisimopoulos, Luna, and two other friends – brothers John and Stefano Barbigiannis – had spent the early morning of July 9, 2005, at clubs other than Click.  However, when the clubs closed at 4:00 a.m., the five men piled into Stefano's SUV – a dark blue Oldsmobile Bravada – and drove to the Intersection in order to buy souvlaki from a cart located

caddy-corner to Click.  Stefano parked his car on Broadway, just outside the club, and the five men then crossed Broadway to the souvlaki stand.  (T. 505, 774–75.)  According to Luna, the men were "buzzed" but not drunk.  (T. 874–75.)

Although it was 4:30 a.m., the Intersection was "really busy," with "a lot of police officers" already present.  (T. 506.)  Geroulakis observed a "huge commotion across the street" in front of Click, with girls fighting and men screaming.  (T. 506.)  Luna observed a "little bit of a commotion," but "did not see any specific people yelling or fighting."  (T. 778.)

Geroulakis and Zisimopoulos each ordered two souvlaki – consisting of small pieces of meat on a wooden skewer – which they consumed together on the corner.  (T. 508.)  After they finished, Zisimopoulos threw a souvlaki stick "very high" and "pretty far away towards the other side of the street," where uniformed police officers were dealing with the commotion.  (T. 510, 657, 659.)  Geroulakis did not see where it landed and did not know if it hit anyone.  (T. 659–60.)

According to Maldonado, she was standing next to Emily, who was talking to the police, when she was struck in the left shoulder by "a shish kabob or stick or something."  (T. 1051.)  Shocked, infuriated, but uninjured, Maldonado yelled and screamed at people across the street.  (T. 1051, 1101, 1171.)  Maldonado herself did not see who threw the item, but other people pointed to a man who appeared intoxicated and was spewing "vulgarity."  (T. 1052, 1102.)

Rodriguez, having retrieved his car and parked it in front of Click, was still in his car when Maldonado was struck by the souvlaki.  (T. 1131, 1162.)  Maldonado started screaming that someone had thrown food at her, prompting Rodriguez to turn to look to see who threw the food.  (T. 1131.)  He saw men standing on the corner cursing and complained to a nearby officer that one of them had thrown food at his "wife."  (T. 1131.)

4

Sgt. James Heffernan, the 114th Precinct's patrol supervisor, was standing with his back to the Intersection when he saw a souvlaki skewer with one or two half-eaten pieces of meat still on it go over his shoulder and strike the back or chest of one of the Hispanic women standing close to him.  (T. 403, 453.)  Fearful that the situation "was going to become a problem," (T. 405), Heffernan crossed the street, told the owner of the souvlaki stand to close, and told the people in line at the stand to disperse.  (T. 406, 427.)   The sergeant then returned to the Hispanic women and told them it was "[t]ime to go home."  (T. 406.)

According to Geroulakis, about a minute after Zisimopoulos threw the stick, he and Zisimopoulos were approached by two women, one of whom was screaming, cursing, and demanding to know who had thrown the stick.  (T. 512.)  At trial, Geroulakis identified a photograph of Maldonado as depicting the screaming woman and identified a photograph of Emily Class as depicting her companion.  (T. 512, 1072.)  Neither Geroulakis nor Zisimopoulos said anything in response, but simply ignored the women and left.  (T. 512.)  After "[m]aybe 2 minutes," the women returned to the other side of the street, where they rejoined a group of "[m]ore than 7" people assembled outside of Click.  (T. 513.)  Maldonado denied ever crossing the street to confront the men she suspected of throwing the stick.  (T. 1053.)

Geroulakis also testified that as he and Zisimopoulos were heading back to Stefano's SUV, two men approached them, cursing and demanding to know why Zisimopoulos – who had a shaved head and who the men called "the bald guy" – had thrown the stick.  (T. 515, 518.)  Geroulakis and Zisimopoulos insulted them, calling one of them a "midget."  (T. 515, 653–54.)  However, an officer separated the two groups of men before anything else could happen and ordered them all to leave the area.  (T. 515.)  Geroulakis and Zisimopoulos then crossed Broadway, where they waited by Stefano's car until he and their other friends returned.  (T. 516.)

After Stefano returned and after Zisimopoulos had already entered the back seat, another man approached the car, screaming, "Where is the bald guy[?]" (T. 516.) According to Geroulakis, he told John Barbigiannis, who was still outside the car, that he was the husband of the woman who was hit with the stick. (T. 517.) Geroulakis testified that shortly thereafter, the woman who was hit joined her husband in cursing and demanding to see "the bald guy." (T. 518.) Standing in front of the tinted rear windows to Stefano's car and confident that the couple could not see inside, Geroulakis told them that the bald guy had already left. (T. 518.) He also explained that Zisimopoulos was so drunk that he didn't know what he was doing and had not hit her on purpose. (T. 519.) Thereafter, everyone shook hands and the couple left. (T. 519.)

Rodriguez's testimony was largely consistent with Geroulakis's. According to Rodriguez, he approached the SUV just after the men who threw the food had entered the back seat. (T. 1132.) He told a man standing on the passenger side that "someone threw food at [his] wife," and angrily demanded to know what was "wrong with him." (T. 1133–34.) After explaining that his friend was "drunk," the man apologized to Rodriguez and shook his hand, prompting Rodriguez to return to his car. (T. 1134–35.) According to Rodriguez, Maldonado remained by the car. (T. 1135.)

While Maldonado largely corroborated Rodriguez's account of the encounter, her account differed in some respects. According to Maldonado, she was getting in the Blazer in front of Click when she saw Rodriguez approach two men who were with the person whom she suspected of throwing the stick. (T. 1102.) Rodriguez asked them to "tell [their] friend to be careful," stating: "He almost hurt my girlfriend." (T. 1054.) Maldonado walked over to Rodriguez just in time to hear the men apologizing. (T. 1054–55.) The men then apologized to Maldonado, Rodriguez apologized to them, and Maldonado and Rodriguez went back to their vehicle. (T. 1055.)

6

As she, Rodriguez, and the Class sisters prepared to drive away in the Blazer, Maldonado saw Class. (T. 1056–57, 1068.) He and two or three other men – none of whom she knew or could identify at trial – were entering a red sedan which, Maldonado believed, belonged to Gonzalez. (T. 1057–58, 1069.) According to Maldonado, that car may have passed them as the Blazer began the trip back to the Class sisters' home in the Clemente Houses in Williamsburg, Brooklyn. (T. 1059.) Rodriguez, like Maldonado, recalled seeing other people who had attended the party enter a red, four-door sedan. (T. 1136.) Rodriguez testified that "Angel," whom he identified as "Marlene's nephew," was among five "guys" who entered the car. (T. 1137–38.) Rodriguez initially claimed that he did not know the names of any of the other guys, (T. 1136–37), but he later testified that he had seen "Cito" driving the red car on the way to Click. (T. 1152–53.) However, Rodriguez claimed that he could not identify "Angel" or "Cito" in court. (T. 1137, 1153.)

After Luna – who was at the souvlaki stand during the confrontation – returned to the car, Stefano drove Geroulakis and three other men away. (T. 519, 780.) Luna was in the driver side rear seat, Geroulakis was in the passenger side rear seat, and Zisimopoulos was between them. (T. 770, 780.) According to Rodriguez, Stefano's car, which had been parked six or seven cars ahead of his, pulled into traffic immediately after Rodriguez began driving, so that it was only two cars in front of Rodriguez. (T. 1138.) Rodriguez continued to follow the car until it stopped on 36th Street. (T. 1136–37.) Thinking the men may have believed Rodriguez was following them, Rodriguez made a right turn "either the block after that or right in front of them." (T. 1139.)

According to Geroulakis, Stefano stopped on 30th Avenue and 36th Street because that was where Geroulakis had parked his car at the start of the evening. (T. 520.) Stefano double parked on 30th Avenue, with the front of his car on 36th Street, and Geroulakis exited the vehicle

through the rear passenger side door.  (T. 520–21, 783–84.)  As he did so, Geroulakis observed a red Dodge Intrepid pull up behind them while a grey vehicle drove directly in front of Stefano's car.  (T. 521.)  Five people then exited the Intrepid, including the man whom Geroulakis had previously derided as a "midget."  (T. 522.)  They surrounded Stefano's car, screaming.  Geroulakis recalled them yelling, "Where's the bald guy?" while Luna remembered them yelling, "Who threw the … stick?"  (T. 522, 785.)

Two of the men, including the "midget," approached Geroulakis, who was right in front of the still open rear passenger side door and the only occupant of Stefano's car who was outside the vehicle.  (T. 522–23.)  The driver of the Intrepid and another man approached the driver's side of Stefano's car, while a fifth man was a foot behind the two who approached Geroulakis.  (T. 525.)  Geroulakis attempted to block their view of the interior of the vehicle, where Zisimopoulos was occupying the middle rear seat.  (T. 525.)  However, the "midget" attempted to push Geroulakis out of the way so that he could look into the car.  (T. 525.)

As Geroulakis attempted to push the man back, he felt a "little pinch" and a "hard push" in the upper part of his right thigh.  (T. 526–27.)  Immediately thereafter, Geroulakis "lost balance in [his] legs," and was pushed toward the back of the car, enabling the two men to access the rear seat of Stefano's vehicle.  (T. 527, 632–33.)  When the men reached into the car, Geroulakis saw that they had blades in their hands and realized he had been stabbed.  (T. 527–28.)

According to Maldonado, Rodriguez was driving back towards Brooklyn when they encountered the "black truck" occupied by the men who had just apologized to her.  (T. 1061.)  Emily immediately yelled out and opened a door of the still-moving Blazer, prompting Rodriguez to stop.  (T. 1061–62.)  The Class sisters then exited the Blazer and ran in the

direction of the black truck.  (T. 1062–63.)  Neither Maldonado nor Rodriguez left the vehicle.
(T. 1062.)

Rodriguez recalled that Emily opened the door just after he passed the car carrying the men and made his turn.  (T. 1139.)  Like Maldonado, Rodriguez recalled that he stopped immediately, then saw Emily exit the car and run back towards the car carrying the men, with Marlene running behind her.  (T. 1140–41.)  Although Rodriguez testified that he also exited the car, he remained near the passenger side of his vehicle and could not see the car carrying the men.  (T. 1140.)

Geroulakis recalled that, just after he was stabbed, one of the women who had earlier crossed the street to confront him and Zisimopoulos emerged from the grey vehicle screaming, "Guys, don't do it.  Let's get out of here."  (T. 527.)  However, the men had already reached inside Stefano's car.  (T. 528.)  Geroulakis testified that both men reached inside at the same time, though the "midget" was closest to the open door.  (T. 565, 638.)  The men only reached inside for "a second" or a "few seconds," then immediately returned to their car.  (T. 530, 661–62.)  Luna, who had been looking at a person standing on the left side of the car outside his car door, turned to his right to see "a hand" exiting the car in what he described as "the motion of a hand being pulled back."  (T. 792–93, 833.)  However, Luna never saw a knife or movements leading him to conclude that there was knife and did not see anyone get stabbed.  (T. 813, 825.)

As the men neared the Intrepid, Geroulakis said, "I can't believe that you stabbed me." (T. 531.)  The "midget" replied, "That's how we do it in Brooklyn."  (T. 531.)  Then the men got back into the Intrepid, the woman returned to the grey vehicle, and Geroulakis got back into Stefano's car.  (T. 532.)  Geroulakis attempted to memorize the Intrepid's license plate but, at the time of trial, could recall only that it was a New York plate and that the second letter was a "D." (T. 532.)

According to Rodriguez, Emily was out of his car for "a matter of seconds" before he saw her running back to his car, screaming, followed by Marlene.  (T. 1142.)  Both women told Rodriguez, "Let's go."  (T. 1142.)  They immediately left the scene and continued their trip to the Clemente Houses on Division Avenue, Brooklyn.  (T. 1064, 1143.)  Shortly after arriving at their destination, Maldonado saw one of the men who had left Click in the red car.  (T. 1064–65.)  She claimed that she did not know his name, but described him as Hispanic, 5'6" tall, and thin.  (T. 1065–66.)  She believed that he was Class's friend and testified that he was talking about what had occurred in Astoria.  (T. 1066.)  Rodriguez testified that guys from the red car were already on Division Avenue by the time he arrived there, and that they were talking about the fight in which Emily was hit.  (T. 1153–54.)

After the stabbing, Stefano drove for several blocks before spotting a marked police car occupied by two uniformed officers:  William Scheffler and Jonathan Seel.  (T. 533, 733, 796–97.)  At trial, Geroulakis recalled telling the officers that the perpetrators were five Hispanics and that they were driving a red Dodge sedan.  (T. 599, 737.)  However, according to Scheffler, Geroulakis told him the perpetrators were driving a red SUV, possibly a Jeep.  (T. 746, 764.)  Luna told the officers about the incident but did not provide descriptions of the perpetrators.  (T. 836.)  Indeed, the officers did not get a detailed description of the perpetrators from anyone before the ambulances arrived.  (T. 762),

A few minutes after 5:00 a.m., Heffernan responded to the scene.  He recognized Geroulakis and Zisimopoulos as being two of the men he dispersed from the souvlaki stand seven or eight minutes earlier.  (T. 409–10.)  Heffernan spoke to Luna, who was only able to describe the perpetrators' vehicle as a red car, possibly a sports utility vehicle.  (T. 433, 458.)  Later, at the 114th Precinct, Luna gave a statement in which he described two men, the shorter of whom he described as Hispanic, 5'5" tall, stocky, and with short hair.  (T. 800–01, 838.)

Geroulakis and Zisimopoulos were transported by ambulance to Elmhurst General Hospital. Zisimopoulos died there on July 10, 2005, (T. 355), the same day that Geroulakis was released from the hospital. (T. 576.) Over the following two days, Geroulakis viewed photographs and a video taken outside Click. (T. 576–77.) On July 12, 2005, he identified a photograph as depicting the husband of the woman who was struck by the stick. (T. 578.)

Rodriguez was not brought to the precinct. However, a "couple of days" after July 9, 2005, Maldonado agreed to go to a precinct to discuss the incident in which Emily was assaulted. (T. 1075, 1095.) There, the police questioned Maldonado primarily about the stabbing and the events that preceded it. (T. 1076.) At about midnight, after 10 to 12 hours of questioning, the police arrested Maldonado and both Class sisters on charges of disorderly conduct and gang assault. (T. 1096, 1100, 1104, 1110.) The police removed Maldonado to a cell but returned periodically to threaten to send her to Rikers Island unless she gave them a statement. (T. 1105.) They also told her that if she cooperated and gave a statement, they would make sure the case against her was dismissed after a couple of months. (T. 1096, 1098, 1108.)

After Maldonado was arrested, Rodriguez called a lawyer who went to the precinct. (T. 1146–47.) Nonetheless, after three hours in the cell, Maldonado gave two written statements. (T. 1097, 1109.) According to Maldonado, the first was incomplete and only partially accurate, (T. 1076), but the second was consistent with her testimony at trial and was truthful. (T. 1077, 1113–14.) Thereafter, she received an A.C.D. – an adjournment in contemplation of dismissal – on the charges against her. (T. 1097.)

In August 2005, Detective David Beutel replaced Detective Robert Henning as the detective assigned to the case. (T. 899.) Beutel testified that he conducted three lineups, the first of which took place on September 14, 2005, and featured Jonathan Andujar. At that lineup, both Geroulakis and Luna identified Andujar as "the one who stabbed [Zisimopoulos]," though Luna

admitted that he was not "100 percent" sure.  (T. 563, 664–65, 668–69, 671, 804–05, 820, 828.)
According to Beutel, Luna said that he "thought" he recognized Andujar but did not say that
Andujar stabbed Zisimopoulos.  (T. 966–67.)

The second lineup took place on September 18, 2005, after Class came to the precinct in
the company of his lawyer.  (T. 936.)  Geroulakis and Luna identified Class as the person who
stabbed Geroulakis.  (T. 569, 808–09, 939.)  Luna, who was certain of the identification but had
not seen anyone stabbed, testified that he had reached a conclusion as to what Class did from an
earlier conversation with Geroulakis.  (T. 855, 967–68.)

In the early morning of November 10, 2005, Detective Constantine Papadapoulos
questioned Gonzalez at the 114th Precinct.  Gonzalez told the detective that he driven to the party
at Click and named some of the partygoers as "Jonathan, Angel, Emily, Reggie [and] Sandy."
(T. 1209.)  Thereafter, Gonzalez agreed to write a statement encapsulating what he had told
Papadapoulos.  (T. 1209.)  In that statement – which was read to the jury – Gonzalez stated that
when he exited Click, he saw "a few fights happening."  (T. 1212.)  After the police arrived, he
saw "food … thrown from across the street hitting one of the girls that was standing outside with
her man."  (T. 1212.)  After the police intervened and told everyone to go home, there was a
"dispute" that lasted "no longer than 2 minutes."  (T. 1212–13.) Gonzalez did not provide any
information regarding the dispute but stated:

> [E]verything happened so fast that I assumed everything was all
> right with the guys. … I was outside of my car when all of this
> happened.  I couldn't see the other side of the car but when the car
> took off it seemed everything was okay.  (T. 1213.)

After completing the first statement, Gonzalez asked if he could write a second statement.
(T. 1211, 1245.)  That second statement was introduced into evidence, (T. 1215), but was never
read to the jury.  Papadapoulos questioned Gonzalez after he completed his second statement.
Gonzalez admitted his nickname was "Cito"; he was driving a burgundy Dodge Intrepid on July

9, 2005; and he had seen "Angel" earlier that night.  (T. 1216.)  Later, Gonzalez volunteered that

"Angel, John, and Reggie" had been in his car that night and, becoming "very irate," said that "if

Sandy … would have manned up and punched the kid in the face that threw the piece of meat

this would have never happened."  (T. 1218.)  He also stated that Sandy was driving a "gray

Jeep" that night and that he had seen his vehicle "in front of the victim's car."  (T. 1218.)

Later that day, Beutel conducted a third lineup, featuring Gonzalez.  (T. 943.)  The

detective was unable to reach Geroulakis, so Luna was the only witness to view this lineup.  (T.

944.)  Luna identified Gonzalez as the person who had been standing outside his car door during

the stabbing.  (T. 812–13, 945.)

Beutel arrested Andujar, Class, and Gonzalez after the lineups in which they were

identified.  (T. 945, 971.)  When asked for pedigree information, Andujar stated that he was

5'10" tall, 160 pounds, and lived in the Clemente Houses in Williamsburg, Brooklyn.  (T. 947.)

Class claimed to be 5'7" tall and 160 pounds, but the detective testified that he "looked

smaller[:]  5'5", 140 pounds."  (T. 947.)  Class told the detective that he, too, lived in the

Clemente Houses, two buildings away from Andujar.  (T. 947.)  Gonzalez lived on FDR Drive

and was 5'10" tall, 200 pounds.  Consulting records from the New York State Department of

Motor Vehicles, Beutel determined that Gonzalez owned a red Dodge Intrepid bearing license

number DDY-8828.  (T. 948–49.)

At trial, Mr. Rothberg questioned Beutel about a UF-49 or "49," a type of police form

submitted by a Squad Commander Officer.  (T. 990–91.)  That form contained a synopsis of the

case which stated, in pertinent part: "the person who is suspected of doing the stabbing is the

husband of the woman who got hit with the stick."  (T. 994.)  Because the report appeared to be

signed by Beutel, Mr. Rothberg asked Beutel about the origins of the statement.  Beutel testified

that a Detective Autera had actually drafted the report based on "bullets written by Officer

13

Borchers of the 114th Precinct," and that the synopsis was based on information Borchers had gathered from Henning and not from interviews with eyewitnesses. (T. 990–91.)

At a sidebar which took place during Beutel's testimony, Mr. Rothberg stated that he had not previously received a copy of the 49 and argued that the failure to disclose this document was "certainly … a *Rosario* violation" and "could be a *Brady* violation as well." (T. 993–94.) In response, ADA Lomp argued that the 49 was not *Rosario* material because it did not contain "a statement of any witness that [he] … called to the stand," but was derived from other information that he had disclosed. (T. 994.) The prosecutor did not specifically address the *Brady* argument, but Justice Aloise ruled that the 49 contained information that defense counsel already had. (T. 998.) Accordingly, he denied all three defense counsel's applications for a mistrial. (T. 999.)

At trial, Geroulakis identified Class, Andujar, and Gonzalez as three of the men who emerged from the Intrepid. He initially identified Andujar as the short man who had stabbed him, (T. 535), but immediately clarified that he recognized Andujar as "the one behind the shorter one." (T. 536.) He then identified Class as "the kid that stabbed me," (T. 536–37), and identified Gonzalez as the driver of the Intrepid. (T. 537.) Luna identified Gonzalez as looking "like the person that was on my left side of the car," Class as the shorter of the two men on the right side of the car, and Andujar as the taller of the two men. (T. 813–14, 818–19.)

After Geroulakis testified, defense counsel inquired as to the existence of a surveillance videotape depicting activity in front of Click. ADA Lomp claimed that he did not have the videotape and that he had spoken to Detective Henning, who also had no memory of it. (T. 691.) However, defense counsel noted that there was a police document indicating that a Detective Collins had shown a videotape to Geroulakis. (T. 691.) The Court directed the prosecution to "make an effort to procure this tape immediately," (T. 691), but the videotape was never found.

14

### B.  The Defense Case

Defense counsel called three witnesses.  One of those witnesses – Andujar's former girlfriend – offered testimony germane only to Andujar's case.  The other two – Officer Seel and Detective Henning – testified that Geroulakis had made prior inconsistent statements.  Seel testified that Geroulakis had told him "that while getting in his friend[']s car a male Hispanic lunged into the car and stabbed him in the right leg …."  (T. 1357.)  Henning testified that Geroulakis said "a male Hispanic approached, asked why someone had thrown food at his wife … and then stabbed the complainants."  (T. 1372.)

### C.  The Verdict and Sentence

Justice Aloise submitted to the jury all five of the counts charged in the indictment, although he directed the jury to consider manslaughter only if it found a defendant not guilty of the murder count.  The jury acquitted Gonzalez of all counts; convicted Andujar of manslaughter in the first degree but acquitted him on all other counts; and convicted Class of all counts other than murder in the first degree and one of the two weapons possession counts.  (T. 1632–39.)  On June 11, 2009, Justice Aloise sentenced Class to consecutive terms of twenty-five years' imprisonment plus five years of post-release supervision for the manslaughter and seven years' imprisonment plus three years of post-release supervision for the assault.  The judge also imposed a one-year term of imprisonment for the weapons possession, which was to run concurrently with the sentence imposed for the manslaughter conviction.

### D.  Direct Appeal

On appeal, Class's appellate counsel raised two issues on his behalf.  First, citing to *Crawford v. Washington*, 541 U.S. 36 (2004), and *Bruton v. United States*, 391 U.S. 123 (1968), appellate counsel argued that Class's Sixth and Fourteenth Amendment rights to a fair trial were violated by the failure to redact a portion of Gonzalez's statement which placed Class in

Gonzalez's car at the time of the stabbing. Second, counsel argued that the 32-year sentence was

excessive, and that the law required that the terms of post-release supervision be concurrent. In

their response, the People conceded that Gonzalez's statement was testimonial in nature and was

improperly admitted at trial but argued that this error was harmless beyond a reasonable doubt.

After the People had responded to these two points, Class filed a *pro se* supplemental

brief raising four others. First, Class argued that he was denied a fair trial by the trial court's

arbitrary and unjust refusal to empanel a separate jury to determine his guilt. Second, he claimed

that he was denied his Sixth and Fourteenth Amendment right to the effective assistance of

counsel because his trial attorney failed to articulate the ground that he and his co-defendants had

antagonistic defenses and did not pursue the argument that Rodriguez had stabbed Geroulakis

and Zisimopoulos. Third, Class argued that his due process rights had been violated by the

"coercive and threatening tactics" which the People used in order to secure Maldonado's

testimony. Finally, Class asserted *Brady* and *Rosario* violations, based largely on the People's

failure to produce the surveillance video which was shown to Geroulakis and to provide the UF-

49. In their response to this *pro se* supplemental brief, the People argued that Class's first and

third arguments were unpreserved, and that all four were without merit.

In a Decision and Order issued on December 19, 2012, the Appellate Division modified

the judgment of conviction by reducing Class's sentence for manslaughter to fifteen years'

imprisonment plus five years' post-release supervision and reducing the sentence for assault to

two years' imprisonment plus two years' post-release supervision but affirmed the judgment of

conviction as modified. *People v. Class*, 101 A.D.3d 1041, 1041–42 (N.Y. App. Div. 2012).

The court found that the People had correctly conceded that Gonzalez's statement was

testimonial hearsay and that the admission of that statement into evidence violated Class's right

of confrontation. *Id.* (citing *Crawford*, 541 U.S. at 52.) However, the court found that the error

was harmless beyond a reasonable doubt, opining that there was "no reasonable possibility that the error contributed to [Class's] conviction, particularly in light of the testimony of two other witnesses, which also placed [Class] in the codefendant's vehicle at the relevant time." *Id.* With respect to arguments raised in the *pro se* supplemental brief, the Appellate Division found that Class's third argument "was unpreserved for appellate review (*see* CPL 470.05[2]) and, in any event, without merit." *Class*, 101 A.D.3d at 1042. It found Class's "remaining contentions" to be "without merit." *Id.*

Andujar raised the same *Crawford/Bruton* issue as Class on his direct appeal. The Appellate Division reversed Andujar's conviction, finding that the confrontation violation which it found harmless in *Class* could not "be deemed harmless beyond a reasonable doubt" in Andujar's case. *People v. Andujar*, 105 A.D.3d 756, 757 (N.Y. App. Div. 2013). The Appellate Division found that the properly admitted evidence establishing Andujar's "identity as one of the assailants was not overwhelming." *Id.*

Class applied for leave to appeal to the New York Court of Appeals, raising all of the grounds raised in his brief and the *pro se* supplemental brief. Class himself submitted a "*Pro Se* Supplemental Leave Application*," in which he highlighted that Andujar's conviction was reversed by the Appellate Division on *Crawford/Bruton* grounds. On May 30, 2013, Chief Judge Lippman denied leave to appeal. *People v. Class*, 21 N.Y.3d 941 (2013).

### E.  The Instant Petition

On August 12, 2013, Class commenced this action by placing his petition for a writ of habeas corpus in his prison mailbox. Class raised three points. In the first, he alluded to the *Crawford/Bruton* issue raised by appellate counsel on direct appeal, asserting that his "right to confrontation was violated by the introduction at trial of [statements of] a non-testifying co-defendant," and that "holding the violation harmless beyond a reasonable doubt entails an

unreasonable application of law." (Petition (Doc. No. 4) at ¶ 11.) Class specifically noted that

Andujar's conviction was reversed on *Crawford* grounds, and asserted that he was denied "equal

protection of the law arising out [of] unfair treatment in parallel appeals …." (Petition at ¶ 11.)

In his second point, Class raised the *Brady* issue which he raised in his *pro se* supplemental brief,

arguing that the prosecution's failure to turn over the "exculpatory police report of 'one stabber'

was objectively unreasonable." (*Id.*) In his third point, Class stated: "The remaining claims

raised in Class's supplemental brief are equally deserving of *habeas corpus* relief." (*Id.*)

In his response, Respondent argued that one of the claims raised in Class's *pro se*

supplemental brief – the due process claim alleging that the People coerced Maldonado into

testifying – was procedurally barred because it was denied on independent and adequate state

grounds. Respondent then addressed the *Crawford* issue, the ineffective assistance of counsel

claim, and the *Brady* claim on the merits.

## STANDARD OF REVIEW

Under 28 U.S.C. § 2254(d), "[a]n application for a writ of habeas corpus on behalf of a

person in custody pursuant to the judgment of a State court shall not be granted with respect to

any claim that was adjudicated on the merits in State court proceedings unless the adjudication of

the claim –

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254. "'Clearly established Federal law' means 'the holdings, as opposed to the

dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'"

*Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362,

412 (2000)) (alterations in original).  A decision is "contrary to" clearly established Federal law

"if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a

question of law or if the state court decides a case differently than [the Supreme Court] has on a

set of materially indistinguishable facts."  *Williams*, 529 U.S. at 413.  A decision is an

"unreasonable application" of clearly established Federal law if a state court "identifies the

correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies

that principle to the facts of [a] prisoner's case."  *Id.*

**DISCUSSION**

**A.  The *Crawford* Claim**

"The Sixth Amendment's Confrontation Clause, which is binding on the States through

the Fourteenth Amendment, provides: 'In all criminal prosecutions, the accused shall enjoy the

right ... to be confronted with the witnesses against him.'"  *Ohio v. Clark*, 135 S. Ct. 2173, 2179

(2015).  The Supreme Court has held that the Sixth Amendment prohibits the introduction of

"testimonial statements by a nontestifying witness, unless the witness is 'unavailable to testify,

and the defendant … had a prior opportunity for cross-examination.'"  *Crawford v. Washington*,

541 U.S. 36, 54 (2004).  The People concede, and the Appellate Division found, that Gonzalez's

statements to Detective Papadapoulos were testimonial and that the admission of these

statements into evidence violated Class's (and Andujar's) Sixth Amendment right of

confrontation.  *See Class*, 101 A.D.2d at 1042.

However, not all federal constitutional errors require automatic reversal.  *Chapman v.*

*California*, 386 U.S. 18, 22 (1967).  The Supreme Court "has 'divided constitutional errors into

two classes': trial errors and structural errors."  *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1916

(2017) (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006)).  The former, which

occur "during the presentation of the case to the jury," may "be quantitatively assessed in the

19

context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Arizona v. Fulminante*, 499 U.S. 279, 307–08 (1991).  The latter are "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards."  *Id.* at 309.  A trial court's erroneous admission of testimonial statements "in violation of *Crawford* … is a trial error subject to harmless-error review."  *A.S. Goldmen, Inc. v. Phillips*, No. 05 Civ. 4385 (PKC) (AJP), 2007 WL 2994453, at *2 (S.D.N.Y. Oct. 15, 2007); *see Neder v. United States*, 527 U.S. 1, 18 (1999) ("[V]iolation of the right to confront witnesses guaranteed by the Sixth Amendment ... [is] subject to harmless-error analysis.").

"The test for whether a federal constitutional error was harmless depends on the procedural posture of the case." *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015).  On direct appeal, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24.  In contrast, "[f]or reasons of finality, comity, and federalism, habeas petitioners are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice." *Davis*, 135 S. Ct. at 2197 (internal quotation marks and citations omitted).  In habeas cases, "relief is proper only if the federal court has 'grave doubt about whether a trial error of federal law had "substantial and injurious effect or influence in determining the jury′s verdict."'" *Id.* at 2197–98 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).  As the *O'Neal* majority explained, "grave doubt" means "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *O'Neal*, 513 U.S. at 435.

In this case, the Court has no doubt that the *Crawford* error did not have a substantial and injurious effect or influence on the jury's verdict.  Gonzalez's statements, if credited by the jury, established at most that 1) Angel was at Emily's birthday party; 2) Gonzalez owned a burgundy

20

Dodge Intrepid on July 9, 2005; 3) Angel rode in Gonzalez's Intrepid at some point that night; 4) there was a short "dispute" following a food-throwing incident at which nothing appeared to happen, although Gonzalez could not see "the other side of the car"; and 5) the dispute would not have occurred had Rodriguez punched the person who threw the food. However, there was ample evidence aside from Gonzalez's statement to establish all of these facts. First, Class's own family and friends established that he attended the party. Maldonado and Marlene Class both identified Class in court and testified that he, as the nephew of both Emily and Marlene, came to the party. (T. 1056, 1177–79.) Second, Beutel testified that records from the New York State Department of Motor Vehicles established that Gonzalez owned a red Dodge Intrepid, (T. 948–49); Maldonado testified that she believed Gonzalez owned the red sedan which Class entered shortly before the stabbing, (T. 1057–58, 1069); and Rodriguez testified that he had seen a person named "Cito" driving the red car on the way to Click. (T. 1152–53.) Third, Maldonado testified that while preparing to leave Click, she saw Class and two or three men she claimed not to recognize entering a red sedan which she believed belonged to Gonzalez. (T. 1057–58, 1069.) Rodriguez corroborated this, testifying that "Marlene's nephew," "Angel," was among five "guys" he saw entering a red car. (T. 1137–38.)

Fourth, even assuming that the "dispute" Gonzalez referenced was the encounter during which the stabbing occurred, there was already ample evidence that Class was at least present. Both Geroulakis and Luna identified Class as a perpetrator of the stabbing. (T. 569, 808–09, 939.) While Luna may not have actually seen anyone stabbed, and while Geroulakis may not have been able to see what happened when the men reached into the car, both witnesses at least placed him at the scene.

Fifth, Class's motive for the stabbing was established by Geroulakis's testimony and other evidence. Geroulakis saw Zisimopoulos throw the stick which struck Maldonado. Shortly

thereafter, two men approached Geroulakis and Zisimopoulos, cursing and demanding to know why Zisimopoulos – whom they called "the bald guy" – had thrown the stick.  (T. 515, 518.)  Later that night, one of the two men, whom Geroulakis identified as Class, and others surrounded Stefano's car, yelling, "Where's the bald guy?"  Luna remembered them yelling, "Who threw the … stick?"  (T. 522, 785.)  According to Geroulakis, Class then stabbed him and reached into the back of Stefano's car, where Zisimopoulos was seated.  This evidence established – more clearly than Gonzalez's vague statement that "this would have never happened" if "Sandy had manned up" (T. 1218) – that the stabbing was motivated by the stick-throwing incident.

Because the evidence provided by Gonzalez's statements was cumulative, Class did not suffer "actual prejudice" as a result of the *Crawford* error.  *See Davis*, 135 S. Ct. at 2197.  The fact that Andujar's conviction was reversed does not mandate a different conclusion.  As the Appellate Division correctly noted, the proof of Andujar's involvement in the stabbing was not "overwhelming."  Neither Maldonado nor Rodriguez identified Andujar as being among the men who they saw entering the red car minutes before the stabbing.  While both Geroulakis and Luna identified Andujar in court and at a lineup, Luna said that he was not "100 percent" sure.  (T. 563, 664–65, 668–69, 671, 804–05, 820, 828.)  Indeed, Detective Beutel recalled that Luna only said that he "thought" he recognized Andujar and did not say that Andujar stabbed Zisimopoulos.  (T. 966–67.)  Finally, Andujar was an average size – 5'10" tall, 160 pounds – while Class was distinctively short – an estimated 5'5" tall, and 140 pounds.  (T. 947.)  Accordingly, any suggestion that the Appellate Division's decisions were inconsistent or denied Class "equal protection of the law" is without merit.

### B.  The *Brady* Claim

In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is

material either to guilt or to punishment, irrespective of the good faith or bad faith of the

prosecution." 373 U.S. at 87. "[F]avorable evidence is material, and constitutional error results

from its suppression by the government, 'if there is a reasonable probability that, had the

evidence been disclosed to the defense, the result of the proceeding would have been different.'"

*Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995) (quoting *United States v. Bagley*, 473 U.S. 667,

682 (1985)). "The government is obligated to turn over *Brady* material 'no later than the point at

which a reasonable probability will exist that the outcome would have been different if an earlier

disclosure had been made.'" *United States v. Hamilton*, 373 F. App'x 95, 97 (2d Cir. 2010)

(quoting *United States v. Coppa*, 267 F.3d 132, 142 (2d Cir. 2001)). "There are three

components of a true *Brady* violation: [1] The evidence at issue must be favorable to the

accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must

have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have

ensued." *Fernandez v. Capra*, 916 F.3d 215, 221 (2d Cir. 2019) (quoting *Strickler v. Greene*,

527 U.S. 263, 281–82 (1999)).

Class has identified two items which are allegedly *Brady* material: 1) a surveillance video

of the outside of Click on the night of the stabbing and 2) a UF-49, prepared by Detective Autera

from "bullets" written by Officer Borcher. The video was allegedly shown to Geroulakis by the

police shortly after the incident, but it was never obtained by the prosecutor. Accordingly, it is

unclear whether it captured any recognizable images or any other material evidence.

The UF-49 contained a synopsis which indicated that police initially believed that

Maldonado's "husband" stabbed both Geroulakis and Zisimopoulos. However, according to

Detective Beutel, this synopsis was written by Detective Autera based on "bullets" written by

Officer Borcher after talking to Detective Henning, who presumably learned this information

from talking to witnesses.  Even assuming that the UF-49 itself could be introduced as a business record, the triple hearsay contained in the synopsis would have been inadmissible.

The late disclosure of the UF-49 did not prejudice Class.  Indeed, Class's counsel appears to have relied on that document as a basis for asking Detective Henning, "Did Michael Geroulakis ever tell you that … a male Hispanic approached, asked why someone had thrown food at his wife … and then stabbed the complainants?"  (T. 1372.)  When the detective responded in the affirmative, Class's counsel had succeeded in placing the substance of the UF-49's synopsis before the jury.  To be sure, the document could have been used as a basis for cross-examining Geroulakis as well, but neither Class's counsel nor any of the other attorneys sought to recall him after the UF-49 surfaced.  Furthermore, as the attorney for co-defendant Andujar conceded, the UF-49 contained no information that defense counsel did not already have.  (T. 996.)

### C.  The Severance Issue

New York law permits two or more defendants to be jointly charged in a single indictment if "(a) all such defendants are jointly charged with every offense alleged therein; or (b) all the offenses charged are based upon a common scheme or plan; or (c) all the offenses charged are based upon the same criminal transaction as that term is defined in subdivision two of section 40.10 …."  N.Y. Crim. Proc. Law § 200.40(1).  While "[s]ome degree of prejudice is of course inherent in every joint trial[,] … that alone does not outweigh the factors favoring joinder of defendants."  *People v. Mahboubian*, 74 N.Y.2d 174, 183–84 (1989).  As both state and federal courts have noted, "a strong public policy favors joinder, because it expedites the judicial process, reduces court congestion, and avoids the necessity of recalling witnesses."  *Id.* at 183 (citing *Parker v. United States*, 404 F.2d 1193, 1196 (9th Cir. 1968)).  "Where proof against the defendants is supplied by the same evidence, only the most cogent reasons warrant a

24

severance." *People v. Bornholdt*, 33 N.Y.2d 75, 87 (1973) (citing *United States v. Kahn*, 381 F.

2d 824, 839 (7th Cir.), *cert. den.*, 389 U. S. 1015 (1967)).

The Supreme Court has expressly declined to mandate severance whenever codefendants

have conflicting defenses. *Zafiro v. United States*, 506 U.S. 534, 538 (1993).  As the Supreme

Court noted, "[m]utually antagonistic defenses are not prejudicial *per se*," and severance is not

required "even if prejudice is shown." *Id.* at 538–39.  Thus, "a simple showing of some

antagonism between defendants' theories of defense does not require severance." *United States*

*v. Carpentier*, 689 F.2d 21, 27–28 (2d Cir. 1982).  "[A]ntagonistic defenses may conflict to such

a degree that codefendants are denied a fair trial," but only when the defenses are "so

irreconcilable as to be mutually exclusive." *United States v. Cardascia*, 951 F.2d 474, 484 (2d

Cir. 1991).  "Defenses are mutually exclusive or irreconcilable if, in order to accept the defense

of one defendant, the jury must of necessity convict a second defendant." *Id.*  In other words,

severance is required when "the jury, in order to believe the core of the testimony offered on

behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his

codefendant." *Carpentier*, 689 F.2d at 28 (quoting *United States v. Berkowitz*, 662 F.2d 1127,

1134 (5th Cir. 1981)).  "Similarly, severance should be granted when antagonism at the essence

of the defenses prevails to such a degree – even without being mutually exclusive – that the jury

unjustifiably infers that the conflict alone indicated that both defendants were guilty."

*Cardascia*, 951 F.2d at 484.

"Under New York and federal law, 'the question whether … a motion to sever should be

granted is committed to the sound discretion of the trial court, and will be reversed on appeal

only where the defendant suffered such prejudice from a joint trial … that the trial court may be

said to have abused its discretion by refusing separate trials.'" *Grey v. Henderson*, 788 F. Supp.

683, 695 (E.D.N.Y. 1991) (quoting *Alejandro v. Scully*, 529 F. Supp. 650, 651 (S.D.N.Y. 1982)).

"Habeas review of a state court's denial of a severance is even more limited than direct appellate review." *Id.* "Petitioner can only mount a successful habeas corpus attack against a state trial court's decision on a request for severance, if petitioner can show that the trial was so prejudicial as to actually render the petitioner's state trial fundamentally unfair and hence violative of due process." *Id.*

In this case, Class has not made the requisite showing. Class principally argues that "all three codefendant's defense[s] did not set out the same goal and underwent internal struggles by virtue of keeping out inadmissible evidence pertaining to codefendant Gonzalez['s] statements inculpating [Class]." (*Pro Se* Supplemental Brief at 1.) However, Class does not argue that the three co-defendants' defenses were antagonistic, much less so antagonistic as to require severance. None of the co-defendants attempted to cast blame on the others. To the contrary, Class himself acknowledged that all three co-defendants essentially argued that the People had not met their burden of proof, stating that his attorney made a "*pro forma* burden of proof" argument; that Gonzalez's attorney argued that his guilt was not proved beyond a reasonable doubt, especially with respect to acting in concert; and that Andujar's attorney argued that his client had been misidentified. (*Pro Se* Supplemental Brief at 6.)

### D. Ineffective Assistance of Trial Counsel

"Because the state appellate division adjudicated the petitioner's ineffective assistance claim on the merits, … the issue for this court is whether the state court unreasonably applied the *Strickland* standard." *Davis v. Mantello*, 42 F. App'x 488, 491 (2d Cir. 2002) (citing *Lindstadt v. Keane*, 239 F.3d 191, 198 (2d Cir. 2001); *Loliscio v. Goord*, 263 F.3d 178, 193 (2d Cir. 2001)). In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-pronged test for deciding ineffective assistance claims. To satisfy the first prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at

688.  "Actions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance." *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) (quoting *Strickland*, 466 U.S. at 689).  Indeed, to satisfy the first prong, a petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689.

To satisfy the second prong, a petitioner must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  The Supreme Court defines "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.*  As the Second Circuit has stated, "[t]he level of prejudice the defendant need demonstrate lies between prejudice that 'had some conceivable effect' and prejudice that 'more likely than not altered the outcome in the case.'" *Linstadt*, 239 F.3d at 204 (quoting *Strickland*, 466 U.S. at 693).

In arguing that his attorney provided ineffective assistance of counsel, Class argues that his lawyer should have advanced a third-party defense, which also would have enabled him to make a more persuasive argument for severance based on antagonistic defenses.  However, the only evidence cited by Class in support of this "third-party defense" was 1) Detective Henning's testimony that Geroulakis initially told him that a single male Hispanic stabbed both complainants after asking "why someone had thrown food at his wife," (T. 1372), and 2) Rodriguez's testimony that he had sent his lawyer to the precinct after Maldonado was arrested. (T. 1146.)  This evidence could not have supported a third-party defense.  First, Henning's testimony – if offered to establish the truth of Geroulakis's statement rather than to establish that Geroulakis made a prior inconsistent statement regarding who stabbed him and Zisimopoulos – would have been inadmissible hearsay.  Second, Class's suggestion that Rodriguez sent an attorney to the precinct "to protect his interests," rather than Maldonado's rights, was unfounded

27

and speculative. Moreover, even if this evidence could have been used to suggest that Rodriguez was the sole stabber, the decision not to rely on this weak third-party defense would have been strategic.

Furthermore, pursuit of this third-party defense would not have strengthened Class's argument for severance. The argument that Rodriguez was the lone stabber would not have cast blame on any of the co-defendants or required the jury to discredit evidence offered on their behalf. If anything, the third-party defense would have bolstered Andujar's claim that he had been misidentified and Gonzalez's claim that there was insufficient proof that he had acted in concert with the stabbers.

### E. The Remaining Claim

Class's remaining claim – that Maldonado was coerced into testifying against him – was denied on an independent and adequate state ground and cannot serve as grounds for habeas corpus relief. "A federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Beard v. Kindler*, 558 U.S. 53, 55 (2009) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). "For a state procedural rule to be considered independent, the 'state court must actually have relied on the procedural bar as an independent basis for its disposition of the case.'" *Danielson v. Lee*, No. 09-CV-3839 (LAP), 2015 WL 4879140, at *7 (S.D.N.Y. Aug. 13, 2015) (quoting *Harris v. Reed*, 489 U.S. 255, 261–62 (1989)), *aff'd*, 715 F. App'x 45 (2d Cir. 2017). "A state procedural rule is considered adequate if it was 'firmly established and regularly followed.'" *Id.* (quoting *Lee v. Kemma*, 534 U.S. 362, 375 (2002)).

In this case, the Appellate Division held: "The defendant's contention, raised in his *pro se* supplemental brief, that he was denied due process when the People subpoenaed a particular

witness to testify at trial is unpreserved for appellate review (*see* CPL 470.05 [2]) and, in any event, without merit." *Class*, 101 A.D.3d at 1042. The Second Circuit has repeatedly held that the so-called contemporaneous objection or preservation of error rule set forth in New York Criminal Procedure Law ("CPL") § 470.05(2) is a firmly established and regularly followed New York procedural rule. *Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011) (citing cases). Although the Appellate Division ruled in the alternative in this case, stating that the contention was "in any event, without merit," it is well established that "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim." *Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir. 1996) (quoting *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990)). Indeed, the Second Circuit has held that a claim denied in the precise same manner as Class's is denied on independent state grounds. *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 811 n.4 (2d Cir. 2000).

"Ordinarily, violation of 'firmly established and regularly followed' state rules … will be adequate to foreclose review of a federal claim." *Lee*, 534 U.S. at 376 (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984)). "There are, however, exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Id.* The Second Circuit has identified three considerations that "guide the inquiry into whether a case fits 'within that limited category." *Garvey v. Duncan*, 485 F.3d 709, 724 (2d Cir. 2007) (quoting *Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir. 2003)). They are:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the

> realities of trial," and, therefore, whether demanding perfect
> compliance with the rule would serve a legitimate governmental
> interest.

*Cotto*, 331 F.3d at 240.

The Second Circuit employed this framework to determine whether the Appellate Division had exorbitantly applied § 470.05(2) in *Garvey*, 485 F.3d 709.  In concluding that this application was not exorbitant, *Garvey* found that all three considerations weighed against the petitioner.  First, the Second Circuit noted that perfect compliance with § 470.05(2) would have given the trial court the opportunity to consider the issues raised by the petitioner on appeal.  *Id.* at 719.  Second, the Court found that there were "no unique set of circumstances" – such as the "sudden" or "unanticipated" event that led the petitioner not to object in *Lee*, 534 U.S. at 382 – that "led Garvey not to comply with § 470.05(2)."  *Garvey*, 485 F.3d at 719.  Third, the Second Circuit found that "demanding compliance with § 470.05(2) serves a legitimate governmental interest in this case, that is to say, the interest in allowing the trial court to have the first opportunity to rule on and possibly rectify any alleged legal error."  *Id.* at 720.

Here, as in *Garvey*, the three considerations weigh against finding that the Appellate Division's application of § 470.05(2) was exorbitant.  Compliance with the contemporaneous objection rule would have given the trial court the opportunity to rule on federal claim that Class now advances.  There were no unique circumstances or sudden and unanticipated events that prevented defense counsel from making a contemporaneous objection.  And demanding compliance with the contemporaneous objection rule serves a legitimate governmental interest in this case, just as it did in *Garvey*.  Accordingly, this is not one of those "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question."  *See Lee*, 534 U.S. at 376.

Since this Court finds that Class defaulted his coercion claim pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred unless he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[ ] will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. To prove cause, a petitioner must "show that 'some objective factor external to the defense impeded counsel's efforts' to raise the claim in state court." *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). "To establish 'prejudice,' [a] petitioner must show a reasonable probability that, but for the alleged violation of federal law, the outcome of his case would have been different." *Restrepo v. Kelly*, 178 F.3d 634, 638 (2d Cir. 1999) (citing *Mathis v. Hood,* 937 F.2d 790, 794 (2d Cir. 1991)). A fundamental miscarriage of justice occurs when "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496; *Doe v. Menefee*, 391 F.3d 147, 160–61 (2d Cir. 2004).

In this case, Class has not demonstrated cause for his failure to preserve the coercion issue. Even if he had, he could not establish prejudice because, as discussed above, the proof of Class's guilt was overwhelming. Finally, there is no evidence of a "fundamental miscarriage of justice" in this case, since Class has not established constitutional violations that "probably resulted in the conviction of one who is actually innocent." *See Murray*, 477 U.S. at 496.

## CONCLUSION

For the reasons set forth above, the instant petition for a writ of habeas corpus is denied and this action is dismissed. A certificate of appealability shall not issue because Class has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). The Clerk of Court is directed to enter judgment in accordance with this Memorandum and

Order, mail a copy of the judgment and this Memorandum and Order to Class, to note that mailing on the docket sheet, and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
September 30, 2019

*Roslynn R. Mauskopf*

_____

ROSLYNN R. MAUSKOPF
United States District Judge